**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION – IN ADMIRALTY**

| | | |
|---|---|---|
| PENNY JO BARNETT, *individually, and as* *Personal Representative of the Estate of* *Edward Barnett,* | ) ) ) ) | |
| Plaintiff, | ) ) | No. 2:20-cv-02517-DCN |
| vs. | ) ) | **FINDINGS OF FACT AND** **CONCLUSIONS OF LAW** |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

The following matter is before the court on plaintiff Penny Jo Barnett's ("Barnett"), individually and as personal representative of the Estate of Edward Barnett, complaint against defendant United States of America's (the "government" or "United States"). ECF No. 1. For the reasons set forth below, the court finds in favor of the government. Further, Barnett filed a motion for judicial notice on October 17, 2022, ECF No. 106, which the court now denies.

## I.  BACKGROUND AND PROCEDURAL HISTORY

This admiralty and maritime action arises out of the Miss June's allision with a contraction dike in the Cooper River in North Charleston, South Carolina on July 6, 2018. The allision resulted in the death of the operator of the vessel, Edward Barnett (the "decedent"). The dike and surrounding navigation lights are owned and operated by the government. According to Barnett, the navigation lights on the dike were not functioning properly at the time of the allision, such that the dike was not visible to approaching boaters.

On July 2, 2020, Barnett filed the instant action against the government in her individual capacity and as personal representative of the estate of her husband.  ECF No. 1.  Barnett alleges a wrongful death cause of action, pursuant to S.C. Code Ann. § 15-51-10, and a survival cause of action for the decedent's pain and suffering prior to his death, pursuant to S.C. Code Ann. § 15-5-90.  She later amended her complaint, first on September 23, 2020, ECF No. 8, and then again on January 27, 2021, ECF No. 28, 2d Amend. Compl.  On December 13, 2021, the court held a bench trial for this case.  Having considered the testimony and exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).  On October 17, 2022—after trial and after both parties had submitted their findings of law and fact—Barnett filed a motion for judicial notice, ECF No. 106, which the government responded in opposition to on October 31, 2022, ECF No. 107.  The court denies Barnett's motion for judicial notice.

## II.  EVIDENCE AT TRIAL[1]

### A.  Stipulations

The United States, at the commencement of trial, entered the following Stipulations into the record:

1.  The United States Army Corps of Engineers (the "Army Corps"), a part of the Department of Defense, is not required to submit a Private Aids to Navigation Application pursuant to 33 CFR §§ 62.1(a); 66.01-1(a)-(b);

---

[1]  These findings are based on the preponderance of the evidence presented to the court.

2

and 66.01-5, to establish or discontinue an aid to maritime navigation.  Tr. 20:17–21:12.

2.  The yellow/amber lights affixed to the dike are, occasionally, incorrectly referred to as Private Aids to Navigation ("PATONs") by the Army Corps and the United States Coast Guard (the "Coast Guard").  The yellow/amber lights are not PATONs.  Tr. 21:15–21.

3.  The yellow/amber lights affixed to the dike are Aids to Navigation ("ATONs") owned by the Army Corps.  Tr. 21:21–22.

4.  The Army Corps did not conduct regular maintenance of the yellow/amber lights on the contraction dike between the time of their installment in 2011 and the allision in July of 2018.  Tr. 21:22–25.

5.  The Army Corps did not conduct verifications or inspections of the yellow/amber lights on the subject dike between February 2014 and the allision of July of 2018.  Tr. 21:25–3.

6.  The center and eastern most yellow/amber lights on the dike were not charted by the National Oceanic and Atmospheric Administration ("NOAA") at the time of the allision of July of 2018.  The western most yellow/amber light, the contraction dike, and ATONs 49-A and 49 were charted.  Tr. 22:4–7.

7.  Lt. Commander Justin C. Heck ("Heck"), the Coast Guard Duty Marine Inspector in Charleston, recorded about ten to fifteen seconds of video of the contraction dike on the night of the allision from the pier on the

Federal Law Enforcement Training Center (FLETC) property.  The United States has been unable to locate this video.  Tr. 22:7–13.

**B.  Navigational Lights**

1.  The red ATON 48-A is charted and is a quick flashing ATON.  Tr. 208:8–16.

2.  The green ATON 49-A is a 20-foot-tall tower and is charted to flash at four-second intervals.  Tr. 206:15-19.

3.  ATON 49 is south of the contraction dike and was flashing every four seconds.  Tr. 207:23–208:2.

4.  ATON 49 is a buoy, floating eight to ten feet over the surface of the water, but anchored to the riverbed.  Tr. 208:8–209:6.

5.  If a mariner is on the river and between the red and green ATONS, the lateral aids, the mariner is in the navigation channel.  Tr. 209:14–16.

6.  The lateral aids tell mariners whether to go left or right.  Tr. 209:17–20.

7.  If a marker is anything other than red or green, it is not a lateral aid and does not tell mariners where to go, but warns about other things.  Tr. 209:21–25.

8.  It is safest to transit the river between the red and green ATONS because mariners will be in the navigable channel that is roughly forty-five feet deep and has no obstructions.  Tr. 210:1–8.

9. Green ATONs demark the left side of the Cooper River navigation channel if a mariner is traveling upriver / from sea.  Red ATONs would mark the right side of the channel when traveling from sea.  Tr. 207:1–4.[2]

10. Christopher Wright ("Wright"), an engineering technician with the Army Corps (Tr. 189:8–9), believes ATONs 49 and 49-A were approximately 700 to 800 feet apart.  Tr. 210:24–211:6.

11. The Daniel Island Bend section of the Cooper River has range lights.  Range lights enable mariners to stay in the center of the navigable channel.  The Daniel Island Bend range lights utilize two towers, one in the foreground that is sixteen feet tall and one further behind that is thirty-eight feet tall, both on the east side of the river.  When these lights are aligned, and the mariner is proceeding upstream, that mariner is in the center of the navigable channel.  Tr. 211:23–213:20.

12. Two lights are charted on the dike, a flashing green channel marker and a flashing yellow light on the westernmost / landward side of the dike.  Tr. 205:15–206:25.

13. In sum, if a mariner is traveling upstream, or with a northern heading, at the location of the allision, the Cooper River curves to the west, or left.  A mariner traveling upstream would first see the green lighted ATON 49, which is slightly southeast of the contraction dike.  On the right side of the river, the mariner would see the red lighted ATON 48A.  If the mariner

---

[2] There is a maritime maxim that, once learned, is impossible to forget: "Right, red, returning."

travels between these two buoys he will always be within the navigation channel—he can ensure he is in the center of the navigation channel by aligning the two range lights.  Upstream of ATON 49 is the green-lighted tower demarking the end of the contraction dike and the left side of the navigational channel, ATON 49-A.  To the left of ATON 49-A are three yellow lights marking the contraction dike as a hazard.  <u>See</u> Government's Ex. 36 at US000145, 36(a), 46 at US003700, 47 at US003701.

**C.  The Contraction Dike**

1. Scott Allen Glass of the Army Corps ("Glass") testified that the contraction dike is roughly 725 feet long.  The green 49-A ATON is on the very end, toward the middle of the river.  The three amber lights are about 200 to 225 feet apart, with the most westerly light 130 feet, more or less, from the shoreline where the rocks jut out and the actual dike begins.  Tr. 145:24 – 146:7; <u>see also</u> Barnett's Ex. 66; Government's Ex. 36(a).

2. Glass testified there are three yellow/amber lights, plus an additional green aid to navigation on the end on the dike.  Tr. 141:17–21.

3. Glass stated that the westerly yellow/amber light is closest to shore and the easterly light is closest to ATON 49-A.  Tr. 8–12.

4. Glass testified that the contraction dike is not in or part of the federal (navigable) channel.  Tr. 105:7–8.

5. Two lights are charted, a flashing green channel marker and a flashing yellow light on the westernmost / landward side of the dike.  Tr. 205:15–206:25.

6. According to LCDR Heck, the amber lights on the dike are identified as east, center, and west lights.  Tr. 317:9–17.

7. The purpose of the amber lights on the dike, according to Glass, are to indicate or mark the structure.  Tr. 107:12–19.

8. It is unclear whether the western-most light marking the dike was lit the night of the allision—the court finds that the western-most amber light marking the contraction dike was out the night of the allision.  The allision occurred on July 6, 2018.  Tr. 118:23–25.  An email dated July 11, 2018 between Army Corps personnel provides that the "NOAA charted private amber light closest to the shore is not functioning."  Barnett's Ex. 63 at US001259.  Thus, the amber light _furthest_ from the channel was not functioning the night of the allision.

## D.  Boat Allision

1. On the night of the allision, the weather was a clear and calm with no issues regarding visibility.  Tr. 252:9–14.

2. The Miss June was a twenty-four-foot aluminum work boat owned by Moran Environmental Recovery ("Moran").  Tr. 476:7–9.

3. Adam Lee Smoak ("Smoak") operated Moran's workboats, including the Miss June.  Smoak indicated that the Miss June had twin engines, was a fast boat, and had a center console through which the operator would look.  Tr. 418:7–419:4.  The Miss June had the helm at midship and was equipped with a GPS chart plotter.  Tr. 435:14–23.  The GPS chart plotter

on the Miss June was not being used at the time of the allision.  Tr. 469:8–18.

4. The Miss June was not equipped with radar, and Hall, an expert witness retained by the USA, testified that the vessel was not required to be equipped with radar.  Tr. 256:14–257:3.  Hall testified there were no OSHA violations, including no training violations, associated with the decedent's operation of the Miss June.  Tr. 274:6–11.

5. Smoak knew the decedent, who was a part-time line handler for Moran.  Smoak was the decedent's supervisor.  Tr. 419:5–8.

6. Smoak did not recall how many jobs the decedent worked for Moran, but it would have been in the hundreds.  Tr. 419:11–18.  Smoak reviewed an e-mail from another Moran employee which stated that the decedent had worked on 524 jobs for Moran.  Smoak said that the number of jobs sounded correct and further testified that about half of those jobs would have been at night, and many of those jobs would have been south of the Moran dock such that the decedent would have had to pass the contraction dike.  Tr. 419:24–421:6.

7. The night of the allision, the decedent was the master of the vessel, and David Rafferty ("Rafferty") was the crew member.  Tr. 258:9–19.

8. Robert Murphy ("Murphy"), a line handler for Moran with a 25-Ton Captain's License, and the decedent's co-worker at the time of the allision, was operating a second boat with Andrew Quattlebaum ("Quattlebaum") serving as his deckhand/crewman.  Tr. 442:4–18.  The boat Murphy was

operating was traveling "a little bit behind" the Miss June after both vessels departed the Kinder Morgan Terminal, which was south of the dike, to return to the Moran dock, which was north of the dike. Tr. 399:22–400:7, 405:13–406:3.

9. With Murphy as the boat operator of the second Moran boat on the night of the allision, Quattlebaum's job was "aid and visibility." Quattlebaum was properly maintaining a lookout. Tr. 448:18–24. Quattlebaum testified that the lookout role on Moran work boats was "pretty lax" and that sometimes people would just be sitting there playing on their phones and not paying attention. Tr. 401:22-402:6

10. Murphy testified that the decedent was wearing his glasses as he departed the Kinder Morgan terminal immediately prior to the allision and that glasses shield a boat operator's eyes from the wind while a vessel is underway. Tr. 451:15–21.

11. In Murphy's experience, if the Miss June was traveling about twenty-five mph, it would be bouncing on the water and that could affect the ability of the master to maintain a lookout. Tr. 436:2–10.

12. Smoak testified that the lookout on the Miss June should have been standing near the bow. Tr. 426:20–22.

13. The allision occurred when the Miss June allided with a contraction dike in the Cooper River. Tr. 118:23–25.

14. Murphy testified that the Miss June allided with the dike about fifty percent to seventy percent towards the tip, closer to the navigation channel.  Tr. 450:14–21.

15. When he and Murphy pulled up to the dike looking for the Miss June, Quattlebaum testified that a yellow dike light was blinking in his face.  Tr. 406:20–407:4.

16. Murphy testified that when he and Quattlebaum initially saw the Miss June after the allision, Rafferty was in the back of the boat. Tr. 449:23–450:2.  Hall's review of the records established that both the decedent and Rafferty were both found by Quattlebaum in the stern or back of the Miss June.  Tr. 249:21–250:5.

17. Quattlebaum testified that the throttles of the Miss June were in the wide-open position when he first observed the vessel, which was approximately near the middle of the dike with the bow straight into it.  Tr. 407:5-17.

18. David John Tantrum ("Tantrum"), an expert on marine casualty and accident investigations, was retained by the government to opine on the speed of the Miss June at the time of the allision.  Tr. 456:18–458:14, 461:3-7, Tr. 469:19-24.  Based on all of the information available to Tantrum, he opined that the approximate speed of the Miss June at the time of the allision was "at least 30 knots," or 34 mph.  Tr. 484:24–485:7.

19. On the night of the allision, LCDR Heck received a call from the U.S. Coast Guard Sector Charleston Command Center about the Miss June allision at about midnight and went to the scene.  Tr. 343:24–344:8.

20. When LCDR Heck went to the dike, he did not specifically remember, but believed the allision occurred within a hundred or so yards of ATON 49-A.  Tr. 346:6–11.

21. Hall testified that based upon the location of the allision, the Miss June was traveling "well outside of the channel."  The green navigation aids ATON 49 and 49-A "should have been on their port or left side," but they "w[ere] well on their starboard side."  The dike itself is outside of the channel, and since the Miss June allided with the dike approximately halfway in the middle of the dike, they were well outside of the navigational channel.  Tr. 251:12–21.  Murphy testified that if a mariner "pass[es] [the green light] on your right side, you were going to end up T-boning the dike."  Tr. 448:11–17.

22. Bryan Johnson's ("Johnson"), a Marine Casualty Investigator with the Coast Guard, investigation involved obtaining information from the Charleston County Coroner's Office.  Johnson determined that there was no evidence of an infarct/heart attack being a causal factor of the allision.  Tr. 68:3–25.  The MISLE, an incident investigation report, prepared by Johnson provides, "The nature of the event causing death, contact injury, collision with fixed object.  Cause of death: Blunt force injuries to chest."  Tr. 69:1–8.  Counsel for the government stipulated that the "United States has no evidence that's going to suggest that Mr. Barnett died from anything other than the allision."  Tr. 303:12–19.

23. A physical inspection of the Miss June revealed: extensive damage to the
    bow, the forward two feet of the boat were completely compromised and
    bent back nearly ninety degrees, the operating console/center console was
    bent in a forward direction with the lower half corner weldments torn from
    the deck, the main deck of the center console was also buckled and pulled
    upward and pressed down in front, the steering wheel of the center console
    was bent over in a forward direction, the fuel tank that was in the stern
    was dislocated from its original holding position and was forward of the
    aft transom seat, and various personal safety equipment was thrown about
    the boat in a haphazard manner.  Tr. 477:2–22.

### III.  CONCLUSIONS OF LAW

Barnett brings two causes of action against the government: (1) a wrongful death
suit and (2) a survival action.  2d Amend. Compl. ¶¶ 42–45.  Barnett alleges that as a
direct and proximate cause of the government's "wrongful, improper, negligent,
negligent per se, grossly negligent, careless, willful, wanton, and reckless conduct,"
Barnett lost the companionship of her husband and that he endured great conscious pain
and suffering before his death.  Id. ¶¶ 43, 45.

These claims are within the court's admiralty jurisdiction and are governed by
substantive admiralty law.  28 U.S.C. § 1333(a); E. River S.S. Corp. v. Transamerica
Delaval, Inc., 476 U.S. 858, 864 (1986); Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981);
Ellis v. Tall Ships Charleston, LLC, 593 F. Supp. 3d 253, 261 (D.S.C. 2022); see also
Green v. Pope & Talbott, Inc., 328 F. Supp. 71, 77 (D. Md. 1971) ("[If] the place of
injury is on a ship, there is maritime jurisdiction .... [I]f the injured person is on the dock

or wharf, or other structure equivalent to land, there is no such jurisdiction." (citing G. Robinson, Handbook of Admiralty Law in the United States § 10 (1939))).

Barnett's complaint alleges that the action falls under the under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 741–52. 2d Amend. Compl. ¶ 2. "All admiralty claims to which the United States is a party fall within the ambit of the [SIAA]." Hurd v. United States, 134 F. Supp. 745, 767 (D.S.C. 2001), aff'd, 34 F. App'x 77 (4th Cir. 2002). Under the SIAA, the United States has consented to be sued in admiralty, which serves as a waiver of sovereign immunity and allows the United States to be sued in this action. Id. at 766. The waiver of sovereign immunity imposes "liability upon the government where the principles of admiralty law would impose liability on private individuals." Id. (internal quotation marks omitted). The government agrees that this is a case of admiralty and maritime jurisdiction such that the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1). ECF No. 29 ¶¶ 2–3.

## A. Discretionary Function Exception

The Discretionary Function Exception to the Federal Tort Claims Act ("FTCA") claim preserves the United States' sovereign immunity against "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the [United States], whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (West 2000). The SIAA does not contain an analogous exception for the discretionary acts of government employees. 46 U.S.C. §§ 741–52. However, the Fourth Circuit has held the discretionary function exception to the FTCA is implicit in actions brought under the SIAA. McMellon v. United States, 387 F.3d 329, 349 (4th Cir. 2004). In applying the

discretionary function exception, the court looks to FTCA cases for guidance.  Wu Tien

Li-Shou v. United States, 777 F.3d 175, 184 (4th Cir. 2015).  If the discretionary function

exception limits the waiver and bars suit, the court lacks subject matter jurisdiction.  See

Williams v. United States, 50 F.3d 299, 305 (4th Cir. 1995).  Thus, even though the

United States waives its sovereign immunity under the SIAA, government immunity

under the Act will remain intact when the facts of the case reveal that the government

was performing a discretionary function.  See Wiggins v. U.S. ex rel. the Dep't of the

Navy, 799 F.2d 962, 966 (5th Cir. 1986).

The discretionary function exception to the FTCA and SIAA is a difficult area of

the law because it challenges typical notions of liability.  Under the discretionary function

analysis, exposure to liability is based, not upon negligence, but upon questions of

"public policy."  The exception exists in order "to prevent judicial 'second-guessing' of

legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort."  United States v. S.A. Empresa de Viacao Aerea

Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).  "As such, the exception is an

acknowledgment that an agency, charged with the daunting task of administering a

government policy or agenda, cannot be expected to create regulations that serve as a

blueprint for all conceivable factual situations arising within the scope of its regulatory

authority."  McMellon v. United States, 395 F. Supp. 2d 422, 427–28 (S.D. W. Va.

2005).  Consequently, when necessary, agencies may enact regulations that empower

government decision-makers with the authority to independently make choices or

judgments based on the underlying policy goals of the regulatory regime.  Id.  Such

decisions are protected from liability by the discretionary function exception to the SIAA

when the decision-maker, exercising his or her government-created discretion, bases the decision on the policy concerns of the governing regulatory regime.  Id.

To determine whether a governmental function is discretionary, the court must engage in a two-step analysis.  The exception applies only (1) when the relevant conduct involves an element of judgment or choice on the part of the government actor and (2) when the conduct involves considerations of public policy, i.e., decisions grounded in social, economic, and political activity.  Hurd, 134 F. Supp. 2d at 767.  The first tier of this analysis "[i]s not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directives."  Appley Bros. v. United States, 7 F.3d 720, 722 (8th Cir. 1993) (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)).  The second prong mandates that a court decide if the "[j]udgment is of the kind that the discretionary function exception was designed to shield."  United States v. Gaubert, 499 U.S. 315, 322–23 (1991) (quoting Berkovitz, 486 U.S. at 536).

Here, the government asserts that the discretionary function exception to the United States' waiver of sovereign immunity deprives the court of jurisdiction over claims challenging certain discretionary actions by the United States, including discretionary decisions regarding the number, type, and characteristics of the lighted aids to navigation on or near the subject dike.  ECF No. 29 at 5 ¶ 6.  Barnett argues that the discretionary function exception is not applicable to the United States' decision to maintain the installed lights on and around the subject dike.  Specifically, Barnett asserts four reasons why the discretionary function exception should not apply: (1) under the Good Samaritan Rule, once the government chose to install an ATON system near the

dike it was obligated to use due care in maintenance of such lights; (2) the challenged

government conduct was not discretionary but rather violated mandatory statutes,

regulations, and policies; (3) the challenged conduct was not discretionary because it was

not a policy grounded in social, economic, or political policy; and (4) the allision was

caused by a dangerous condition created by the United States and known to the United

States and the failure to eliminate or warn of that condition proximately caused the

allision.

From a preliminary standpoint, Barnett's arguments regarding candela,

background lighting, and flashing lights are without merit as those decisions fall within

the discretion of the government.[3]  As relevant to the instant motion, the Coast Guard is

given a level of discretion in establishing the navigational lights under 14 U.S.C. § 545

("The Secretary shall prescribe and enforce necessary and reasonable rules and

regulations, for the protection of maritime navigation, relative to the establishment,

---

[3] Specifically, Barnett alleges that the government was negligent in the following
ways: (1) failing to safely and properly establish Light 49A and Light 49—as established,
the aids were a source of confusion to boaters, and Light 49A was established with an
improper nominal range; (2) failing to safely and properly maintain Light 49A and Light
49—the USA maintained the aids in a confusing state, and Light 49A was established
with an improper nominal range; (3) failing to safely and properly inspect Light 49A and
Light 49—the USA inspected the aids and knew, or should have known, the aids were a
source of confusion, had insufficient candela and/or nominal range; (4) failing to safely
and properly service Light 49A and Light 49—changing the flash frequency of either
light was an easy task accomplished via the use of a remote control yet the USA never
took the necessary steps to eliminate the confusion caused by the aids; (5) failing to
safely and properly establish the lights affixed to the dike—from the outset, the USA
failed to consider background lighting and its impact on the visibility of the lights; (6)
failing to safely and properly maintain, inspect, service, and repair the lights affixed to
the dike—the USA was not even aware it owned the lights; (7) failing to safely hire,
train, supervise, manage, and retain its aids to navigation personnel—Glass, the Army
Corps Navigation Chief, never owned or reviewed the ATON Manual, never consulted
the Light List, and has no training in the area of aids to navigation; and (11) and failing to
use due care.

maintenance, and operation of lights and other signals on fixed and floating structures in or over the waters subjected to the jurisdiction of the United States."). Further, the purpose of the ATON system set forth in the federal regulations emphasizes the Coast Guard's discretion. 33 C.F.R. § 62.1(c) ("The aids to navigation system is not intended to identify every shoal or obstruction to navigation which exists in the navigable waters of the United States, but rather provides for reasonable marking of marine features as resources permit.").

Here, for example, Barnett argues that the dike is an obstruction in a sharp turn which requires the government to install a particular light at that location under the Coast Guard's 2018 Light List. See Barnett's Ex. 156 at US008375. But, the Light List does not explain what constitutes a "sharp turn"; instead, the determination of whether terrain requires specific flashing lights or candela is left to the Coast Guard's discretion. See 33 C.F.R. § 62.45 (explaining light characteristics on ATONS but leaving to the Coast Guard's discretion the exact rhythm or use of light-reflecting material as evidenced by the word "may"). Consequently, the first prong of the discretionary function exception is met. Similarly, the second prong is also met because public policy is implicated where such a decision has vast economic implications. As the Fourth Circuit explained:

> Given the tremendous expense which would undoubtedly be involved in lighting all the authorized obstructions under the control of the Coast Guard, in the absence of a Congressionally imposed requirement of additional marking, we feel that it is usually inappropriate for a federal court to impose such a requirement and in effect direct the Coast Guard how to spend its limited resources.

Magno v. Corros, 630 F.2d 224, 229 (4th Cir. 1980). Thus, the discretionary function exception applies to those negligence claims relating to background lighting, flashing rhythms, or candela, and they are barred under sovereign immunity.

17

The discretionary function exception does not apply to the question of the government's <u>maintenance</u> of the lights. The discretion of lights' maintenance is limited by 33 C.F.R. § 62.21(g), which specifies that the Coast Guard should "make reasonable efforts to inform the navigator of known discrepancies, and to correct them within a reasonable period of time, depending on resources available." 33 C.F.R. § 62.21(g). Given that the court has found that Army Corps personnel noted that the amber light closest to shore was not functioning and that the government stipulated that the Army Corps did not conduct regular maintenance or inspections of the lights, it is debatable whether the Army Corps or Coast Guard corrected that failure "within a reasonable period of time," as is explicitly required by statute. The Coast Guard and the Army Corps have conceded that they have no discretion or choice but to comply with these regulations and the Aids to Navigation Administration Manual ("ATON Manual"), which is the Coast Guard manual that specifies the requirements for aids to navigation. <u>See, e.g.</u>, Tr: 329:15–21, 330:8–24 (Heck Testimony). The issue here is not whether sufficient lighting was provided, but rather if the marked ATON lights were in fact lit. The court therefore finds that pursuant to the cited statutes and testimony from members of the Coast Guard, the decision to maintain lights and aids to navigation on the dike was not discretionary but rather had explicit requirements per federal statutes and regulations. In other words, it is not a question of discretion whether a light is "on" or "off"; rather, it is well-established by federal regulations and statutes that once an aid to navigation is established and charted it should remain lit since mariners will rely on its presence to navigate their vessels. Therefore, the government has failed to meet the requirements for the first prong of the discretionary function exception.

Consequently, the court finds that the negligence claims regarding whether the government adequately maintained the aids to navigation are not barred by sovereign immunity, and the court proceeds to examine the merits of those claims.

### B. Choice-of-Law

The substantive law governing a defendant's liability in an admiralty action is to be adjudicated under general maritime law, while state law may be used to assess damages. Hurd, 134 F. Supp. 2d at 769 (citing Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 206, 216 (1996)). The Supreme Court held that where non-seaman are killed in territorial waters of the United States, a party may assert a claim for relief under state law for survival and wrongful death damages. See Yamaha Motor Corp., 516 U.S. at 202 ("State remedies remain applicable in such cases"). In other words, state law may supplement the measure of damages while maritime law provides the substantive law. Hurd, 134 F. Supp. 2d at 769.

This action sounds in admiralty; therefore, federal choice-of-law rules determine the law governing Plaintiffs' claims for damages. See Calhoun v. Yamaha Motor Corp., 216 F.3d 338, 345 (3d Cir.2000), cert. denied, 531 U.S. 1037 (2000). Federal choice-of-law rules require the court to analyze which state has "the most significant relationship to the incident and the dominant interest in having its law applied." Id. In applying federal choice-of-law rules, courts consider the following factors for admiralty cases: (1) place of the wrongful act or the "lex loci delicti commissi;" (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of a foreign forum; and (7) the law of the forum. Lauritzen v. Larsen, 345 U.S. 571, 583–91 (1953). Here, Barnett is a resident of South Carolina and the

19

accident occurred on the Cooper River, North Charleston, South Carolina. 2d Amend.
Compl. ¶¶ 1–3. The parties do not contest the application of South Carolina law—
namely a wrongful death action, SC Code § 15-51-10, and a survival claim action, SC
Code § 15-5-90. Id. ¶ 6; ECF No. 29 ¶ 6. The court thus relies on South Carolina law in
determining damages for this action.

When federal maritime law applies, the state law "is preempted by federal
maritime tort law." State of Md. Dep't of Nat. Res. v. Kellum, 51 F.3d 1220, 1228 (4th
Cir. 1995) (citing Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 410 (1953)); see also Byrd,
657 F.2d at 617 ("A state law, even though it does not contravene an established principle
of admiralty law will, nevertheless, not be applied where its adoption would impair the
uniformity and simplicity which is a basic principle of the federal admiralty law." (citing
Moragne v. States Marine Lines, Inc., 398 U.S. 375, 402 (1970))). "However, if there is
no admiralty rule for a particular issue, the court looks to state law to supply the rule of
decision." Holt v. Brown, 185 F. Supp. 3d 727, 734 (D.S.C. 2016) (citing Byrd, 657 F.2d
at 617). "This rule is especially true in negligence causes of action." Schumacher v.
Cooper, 850 F. Supp. 438, 447 (D.S.C. 1994). Thus, when considering negligence claims
under maritime law, courts within this district have on occasion chosen to supplement
their analysis with state law, finding that maritime law does not address all of tort law.
See Holt, 185 F. Supp. 3d at 734–35 (applying South Carolina negligence law); Tisdale v.
Teleflex, Inc., 612 F. Supp. 30, 40 (D.S.C. 1985) (applying South Carolina strict liability
law for "expedien[cy]" because it did not vary from federal maritime law); Ellis, 593 F.
Supp. 3d at 263–64 (applying South Carolina negligence law related to control). To the

extent that federal maritime law does not clearly govern this negligence cause of action, the court supplements its analysis with South Carolina state law.

## C. Negligence

In admiralty cases, a plaintiff's cause of action for negligence is to be determined under the principles of maritime negligence law rather than common law negligence. Ellis, 593 F. Supp. 3d at 261 (citing Hawn, 346 U.S. at 411). Federal maritime law recognizes a general maritime law cause of action for wrongful death based upon negligence. See Garris v. Norfolk Shipbuilding & Drydock Corp., 210 F.3d 209, 219 (4th Cir. 2000), aff'd, 532 U.S. 811, 816 (2001) ("Where existing law imposes a primary duty, violations of which are compensable if they cause injury."). Federal statutory law in this area also permits recovery for negligence.[4] See e.g., Jones Act, 46 U.S.C.

---

[4] The Supreme Court has held that even in admiralty, "we have no authority to substitute our views for those expressed by Congress in a duly enacted statute." Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 626 (1978). Hence, when a statute resolves a particular issue, the Court has held that the general maritime law must comply with that resolution. See, e.g., Dooley v. Korean Air Lines Co., 524 U.S. 116, 123-124 (1998). The Jones Act, 46 U.S.C. § 688(a), establishes a cause of action for negligence for injuries or death suffered in the course of employment, but only for seamen. See generally Chandris, Inc. v. Latsis, 515 U.S. 347 (1995) (describing test for seaman status). Moreover, even as to seamen, the Supreme Court has held that "general maritime law may provide wrongful-death actions predicated on duties beyond those that the Jones Act imposes. Norfolk Shipbuilding, 532 U.S. at 818 (citing Miles v. Apex Marine Corp., 498 U.S. 19, 38–30 (1990) (finding a duty as to vessel seaworthiness)). DOHSA creates wrongful-death actions for negligence and unseaworthiness but only by the personal representatives of people killed "beyond a marine league from the shore of any State." Id.; 46 U.S.C. § 761. But DOHSA expressly provides that it does not apply in state territorial waters. Id.; 46 U.S.C. § 767. Finally, LHWCA, 22 U.S.C. § 901 et seq., provides non-seaman maritime workers with no-fault workers' compensation claims (against their employer, § 904(b)) and negligence claims (against the vessel, § 905(b)) for injury and death. Id. LHWCA expressly preempts all other claims against their employer and vessel, §§ 905(a), (b) but preserves all claims against third parties. §§ 933(a), (i). Thus, statutory negligence is not implicated here because the United States is not the decedent's employer under the Jones Act, the allision occurred less than one nautical mile from shore, and the decedent, as the operator of the Miss June, was not

21

§ 688(a); <u>Death on the High Seas Act</u> ("DOHSA"), 46 U.S.C. § 761 <u>et seq.</u>; <u>Longshore and Harbor Workers' Compensation Action</u> ("LHWCA"), 33 U.S.C. § 901 <u>et seq.</u> In sum, if there is a negligent breach of a maritime duty of care, a plaintiff may recover for the resulting death. <u>Norfolk Shipbuilding</u>, 532 U.S. at 816–17.

The elements of a maritime negligence cause of action are: (1) the existence of a duty required by law that obligates a person to conform to a certain standard of conduct in order to protect another against unreasonable risks of harm; (2) a breach of the said duty by engaging in conduct that falls below the applicable standard; (3) a causal connection between the improper conduct and the resulting injury; and (4) an actual loss or injury to the plaintiff due to the improper conduct. <u>Ellis</u>, 593 F. Supp. 3d at 261 (citing <u>Schumacher v. Cooper</u>, 850 F. Supp. 438, 447 (D.S.C. 1994)). The plaintiff has the burden of proof for each of these elements in a maritime negligence cause of action. <u>Id.</u> The standard of proof is a preponderance of the evidence, whether direct or circumstantial, and the sufficiency of the evidence is governed by federal law. <u>O'Bannon v. Green</u>, 2005 WL 8164681, at *3 (D.S.C. July 21, 2005). The court turns to the elements of a negligence cause of action to evaluate the merits of Barnett's claim.

### 1. Duty and Breach

The analysis of duty and breach are interrelated, as they turn on the question of foreseeability. Tort law imposes "a duty to exercise reasonable care" on those whose conduct presents a risk of harm to others. 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, p. 77 (2005); <u>Air & Liquid Sys. Corp. v. DeVries</u>, 139

---

a non-seaman maritime worker. Consequently, any recovery Barnett seeks is under common law maritime negligence.

S. Ct. 986, 993 (2019).  General maritime law imposes a duty to exercise reasonable or ordinary care under the circumstances, including the duty to warn of foreseeable dangers and to refrain from injuring someone.  See Bubla v. Bradshaw, 795 F.2d 349, 353 (4th Cir. 1986).  A breach of the duty of ordinary care can be found when defendant acts negligently, or without such care.

### i.  Duty to Maintain the Contraction Dike Lighting

The extent of the government's duty to maintain the lights on the dike is unclear, much less what would constitute reasonable "maintenance."  However, given the existing authority relating to government maintenance of aids to navigation the court finds that the government did not breach its duty.  But, this determination is not germane to the court's determination because of Barnett's total failure to meet the causation prong of negligence as discussed below.

Although neither party discusses it, the Fourth Circuit has evaluated the exact issue of government liability for failure to light a dike in a negligence action following an allision and found that the government did not breach its duty in the lighting of said dike. Magno v. Corros, 630 F.2d 224 (4th Cir. 1980).  In that case, the plaintiff sued the United States alleging that the government's failure to properly light the dike was the cause of the accident notwithstanding the fact that the boat was outside the navigational channel, the allision occurred at night, and the boat driver failed to keep a lookout.  Id. at 225–27. The dike at issue had only one light at the end of it, and the Fourth Circuit first found that the United States was not "under a duty to provide additional lighting or some other type of marking on the dike as a warning to boaters in the area."  Id. at 228.  Since there was no duty, there was no breach of that duty.  Id.  The court in Magno held there was no

negligence for having just one light in the absence of any authority or evidence that would impose upon anyone a duty to mark the dike more clearly than the United States did in that case.  Id. at 228.  Based on Magno, it would be illogical for the court to now hold that a similarly situated dike, lit with three if not four lights, was not clearly lit when Barnett has similarly failed to provide authority or evidence to adduce otherwise.

Second, the Fourth Circuit found the holding in Indian Towing Co. v. United States, 350 U.S. 61 (1955), inapplicable to Magno because "at no time did the government exercise its discretion to lead the public or the plaintiff to believe that there was safe passage between the light [at the end of the dike] and the land."  Magno, at 630 F.2d at 229.  In Indian Towing, the Coast Guard volunteered to undertake the lighthouse service and thereafter failed to make certain that the light was kept in good working order.  350 U.S. at 69.  There, the light in the lighthouse went out, and consequently a boat relying on the lighthouse's guidance ran aground.  Id. at 62.  The reliance upon that lighting, or failure to light the lighthouse, is relevant when read alongside Magno where the court emphasized that "the Coast Guard undertook only to light the channel end of the dike with a light, and at no time did it fail to perform that undertaking."  630 F.2d at 228.  Thus, the key distinction between those cases is the reliance upon the faulty lighting more so than the failure to light itself, as is shown in subsequent caselaw.

The Fourth Circuit again considered the application of Indian Towing to whether the government had a duty to maintain safe conditions on navigable waters which it "owns" in Faust v. South Carolina State Highway Department.  721 F.2d 934, 939 (4th Cir. 1983).  That court held that "[t]he principle laid down in Indian Towing requires no more than that the government not injure sailors or boaters by inducing reliance on

misleading navigational aids.  It imposes no general duty upon the government to ensure navigable waters are safe or to provide warning devices."  Id. (emphasis added).  Barnett argues that Indian Towing continues to provide applicable guidance since it is alleged that one of the lights on the dike was out, but this argument requires the court to find that the light being out constitutes a "misleading navigational aid."  See id.

Certainly, once the government undertook to light the dike, it had a duty to not do so negligently.  See Indian Towing, 350 U.S. at 69 (establishing the Good Samaritan Rule whereby the Coast Guard created for itself a duty to maintain the lighthouse lighting and use due care to discover if the light has been extinguished once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light).  Per Faust, negligence in this context is defined as ensuring that the lighting does not "induc[e] reliance on misleading navigational aids."  721 F.2d at 939.  It is debatable whether allowing one of the four lights on the dike to go out is negligent—or, in other words, a breach of that duty.  The dike did not have its sole light go out, but rather had at least three lights lit and indicating the presence of the dike on the night of the allision.[5]  Since the dike's extension into the river was well lit, notwithstanding the possible failure of the light closest to shore, it cannot reasonably be interpreted to have led the decedent to believe "there was safe passage between the light and the land."  Magno, 630 F.2d at 229.  Consequently, it is arguable whether a breach of the duty occurred, since it would be illogical to hold that an otherwise well-lit dike would induce reliance on a misleading navigational aid.  As an analogy, consider a drone attempting to

---

[5] There is no evidence that the two lights closest to the site of the allision were not working at the time the Miss June hit the dike.

fly above a tree that is covered with lights except for its trunk and roots.  If the drone fails to clear the top of the tree, was the lighting of the trunk the issue?  The failure of the light furthest from the clearly marked channel would not induce reliance, therefore, there would be no breach of duty.

Although the court finds that the government did not breach its duty, the court accepts that the determination may be subject to differing views.  Accordingly, the court proceeds to analyze causation, finding that the issue of causation clearly guides the court towards the same resolution.

### 2.  Causation

The government's alleged failure to maintain the aid to navigation closest to shore on the dike did not proximately cause Miss June's allision with the middle to far side of the dike.[6]  Consequently, Barnett's negligence cause of action must fail.

"Generally, proximate cause in the admiralty context is defined as that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened."  Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc., 774 F.2d 648, 655 (4th Cir. 1986).  "The doctrine of

---

[6] Specifically, the court finds that the contraction dike was approximately 750 feet in length.  The three amber lights are about 200 to 225 feet apart, with the most westerly light maybe 130 feet from the shoreline where the rocks jut out and the actual dike begins.  The amber lights are identified as east, center, and west lights.  Barnett alleges that the west light was out at the time of the allision.  Barnett's Ex. 97 at US003706.  Murphy testified that the Miss June allided with the dike about fifty percent to seventy percent towards the tip, closer to the navigation channel.  Tr. 450:14–21.  In other words, the amber lights that should have warned the decedent of the risks posed by the contraction dike—the center and east lights—were not malfunctioning and were lit the night of the allision.  The west light was therefore less relevant than either the center or east lights and its malfunction did not cause the allision, since the decedent managed to ignore the more salient warnings from the functioning center and eastern lights.

superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837 (1996) (citations omitted). "It is properly applied in admiralty cases." Id.; Evergreen Int'l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 312 (4th Cir. 2008) (applying the doctrine of superseding cause to a maritime negligence case).

Thus, the government's alleged failure to maintain the westernmost light on the dike was not the proximate cause of the allision. First, the alleged breach of duty—failure to maintain all the lights on the dike—did not proximately cause the allision. There are three yellow lights marking the dike, plus an additional green aid to navigation on the end. Even if the light closest to shore on the contraction dike were out, it could not be a proximate cause of the accident because the remaining three lights on the dike were lit and none of the lighting suggested that the waterway was safe outside the navigable channel. See Magno, 630 F.2d at 229. Had the decedent opted to use the onboard GPS chart plotter—which he did not—he could have seen that the westernmost light was on that chart, even if it was not visible that night. The court disregards Barnett's references to alternative lighting options and subsequent changes to the lighting of the dike as an inappropriate use of a subsequent remedial measure to prove negligence.[7]

---

[7] It is well established that "[e]vidence of repairs or of other safety measures adopted after an accident occurs is not admissible to 'prove negligence . . . .'" U.S. Fid. & Guar. Co. v. Jadranska Slobodna Plovidba, 683 F.2d 1022, 1029 (7th Cir. 1982) (Posner, J.) (quoting Fed. R. Evid. 407). Subsequent remedial measures are only admissible to prove feasibility, but "only if feasibility is controverted by the defendant." Werner v. Upjohn Co., 628 F.2d 848, 853 (4th Cir. 1980). The government does not contest the feasibility of the measures. Consequently, to the extent Barnett makes

Second, the decedent's operation of the Miss June outside of the navigational channel was the superseding cause of the allision. Had the decedent remained in the navigational channel, he would have avoided all stationary hazards. Having navigated that channel hundreds of times before, the decedent had to have been aware of the dike and taken care to avoid it. Furthermore, the decedent's failure to post a lookout or use lighting to ensure a clear channel contributed to the accident, as did his decision to not use the onboard GPS chart plotter which would have shown the charted lights along the dike and the navigational channel markers. See Vollmar v. O.C. Seacrets, Inc., 831 F. Supp. 2d 862, 869 (D. Md. 2011) (finding that fog causing visibility problems augmented by the absence of radar was a superseding cause of the allision).

Altogether, the court finds that Barnett has failed to establish causation and therefore cannot recover on her claim. Mr. Barnett was an experienced mariner. His decision to travel outside the channel is as inexplicable as it is tragic. The allision was a tragedy for all parties involved, but it was not a tragedy caused by the government. Therefore, under maritime negligence jurisprudence it would clearly be inappropriate to allow recovery from the government. Though the court could stop its analysis with this finding that the plaintiff has failed to carry her burden to prove her negligence cause of action, it proceeds to analyze the government's affirmative defense of comparative negligence—that the decedent's negligence proximately caused the accident.

### 3. Affirmative Defense: Comparative Fault

---

arguments reliant upon subsequent remedial measures to prove the government's negligence—such as the government replacing the three lights affixed to the dike with lights that have a higher candela after the allision—those arguments are inadmissible.

In <u>United States v. Reliable Transfer Co.</u>, 421 U.S. 397 (1975), the Supreme Court abolished the doctrine of mutual fault-equal contribution and announced the rule that damages in maritime cases should be apportioned according to comparative fault. The Supreme Court held that "when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." <u>Id.</u> at 411; <u>see also</u> <u>Hawn</u>, 346 U.S. at 409 (upholding lower courts' decision that comparative negligence applied in maritime cases).

In examining the decedent's negligence, the court first considers whether the decedent violated any statutory rules intended to prevent collisions, <u>see</u> <u>The Pennsylvania</u>, 86 U.S. 125 (1873), before turning to the common law presumption of negligence stemming from the presumption that a moving vessel is at fault for alliding with a stationary object, <u>see</u> <u>The Oregon</u>, 158 U.S. 186, 192–93 (1895).  Upon evaluating the decedent's relative fault in causing the allision, the court reinforces its holding that the decedent's negligence was the superseding cause of the allision.

### a.  The Pennsylvania Rule

A finding that a vessel violated good seamanship principles may impose upon that vessel the burden of showing by clear and convincing evidence that such a failure did not contribute to the accident.  "[T]his shift of burden can occur either by application of the Fourth Circuit's decision in <u>Anthony v. International Paper Co.</u>, 289 F.2d 574 (4th Cir. 1961), or by finding that such breach of an Inland Navigational Rule constitutes statutory fault, thus invoking [the] burden-shifting rule of <u>The Pennsylvania</u>[.]"  <u>Schumacher</u>, 850 F. Supp. at 451.

To determine each party's burden of proof, the court first considers the Pennsylvania Rule. Neither party directly addresses the Pennsylvania Rule, though the government invokes the common law rule of prudent seamanship, which falls under the Pennsylvania Rule. According to the Pennsylvania Rule, as first stated, when

> a ship at the time of a collision is in actual violation of <u>a statutory rule intended to prevent collisions</u>, . . . the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

<u>The Pennsylvania</u>, 86 U.S. 125, 136 (1873) (emphasis added). There is no dispute that the Pennsylvania Rule applies equally to allisions such as the one that occurred in this case. Moreover, although the rule speaks of a statutory violation, it is equally applicable to violations of federal regulations. <u>Belden v. Chase</u>, 150 U.S. 674, 698 (1893). Notably, the Pennsylvania Rule does not establish fault; rather, it shifts the burden of proof on the element of causation to the party who violated the statutory rule or regulation at issue to prove that such violation could not reasonably be held to have been the cause of the collision or allision. <u>U.S. Fire Ins. Co. v. Allied Towing Corp.</u>, 966 F.2d 820, 824–25 (4th Cir. 1992); <u>Evergreen Int'l</u>, 531 F.3d at 310. In other words, Barnett must prove that the decedent's own negligence aboard the Miss June did not cause or contribute to the allision. <u>See</u> <u>Evergreen Int'l</u>, 531 F.3d at 310. She cannot do so.

It is well-established in general maritime law that a vessel operator has a duty to exercise reasonable care for the safety of his passengers. <u>E.g.</u>, <u>Bubla</u>, 795 F.2d at 353 (quoting <u>Kermarec v. Compagnie Generale Transatlantique</u>, 358 U.S. 625, 630 (1959)). He also "has a duty to maintain a proper lookout by sight and by hearing" while the boat is travelling through navigable waters. <u>Schumacher</u>, 850 F. Supp. at 447. "This duty stems from general concepts of prudent seamanship as well as from the [regulations]

30

governing the navigation of vessels." <u>Id.</u> As a matter of prudent seamanship, "the performance of lookout duty is an inexorable requirement of prudent navigation." <u>Anthony</u>, 289 F.2d at 580. As for regulations, Rule 5 of the Inland Navigation Rules states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. Rule 5 perpetuates the common-law duty discussed in <u>Anthony</u>. <u>Schumacher</u>, 850 F. Supp. at 448 (citation omitted); <u>see also</u> <u>Todd v. Schneider</u>, 2003 WL 23514560, at *12 (D.S.C. Dec. 8, 2003). Rule 5 "must be followed precisely." <u>Todd</u>, 2003 WL 23514560, at *11.

"The duty to maintain a proper look-out, whether regulatory or customary, varies with the circumstances of each situation. When circumstances demand unusual care in navigation, such care should be used." <u>Schumacher</u>, 850 F. Supp. at 449–50 (citing <u>United States v. Vereen</u>, 236 F. Supp. 1018, 1020 (E.D.S.C. 1965)). That higher level of care was required here. Courts in this district have found that when parties are travelling at night along a watercourse where there are hazards that abut the outer boundaries of the navigational channel, they must exercise heightened care. <u>Cf.</u> <u>Todd</u>, 2003 WL 23514560, at *12–13 (finding geographic obstructions required the defendant to "exercise increased vigilance").

Similarly, vessels are required under Rule 6 of the Inland Navigation Rules to "proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions." 33 C.F.R. § 83.06. This means at night, vessels should exercise heightened

31

care not only with their lookout, but also by reducing speed since there is diminished visibility.  See 33 C.F.R. § 83.06(a).

The night of the allision, the decedent, while operating Miss June, violated statutory regulations that are in place to prevent collisions.  The weather was clear and calm with no issues regarding visibility.  Tr. 252:9–14.  LCDR Heck received a call from the U.S. Coast Guard Sector Charleston Command Center about the Miss June allision at around midnight, meaning the decedent was operating the Miss June in the dark of night and was required to use increased care by posting a lookout and slowing down the speed of his boat.  Tr. 343:24–344:8.  Since Rafferty was found in the stern of the Miss June after the allision, rather than in the bow where the lookout should have been posted, the court finds that the decedent did not post a lookout in violation of Rule 5.  See Tr. 426:20-22, 449:23–450:2, 249:21–250:5.  Moreover, the testimony at trial supports the finding that the Miss June was operated at an unsafely high speed at the time of the allision given the prevailing conditions and visibility on the water.  If the Miss June was traveling at least twenty-five mph—as Murphy testified—she would be bouncing on the water, and that could affect the ability of the decedent to maintain a lookout.  Those factors, in turn, should have prompted the decedent to decrease the speed to comply with Inland Navigational Rules 5 and 6.  Tr. 436:2–10.

Since the decedent violated statutory regulations on the night of the allision, the court finds him negligent.  His negligence does not preclude recovery from the government should the court find the government negligent too, though the decedent's negligence would impact the apportionment of damages.  See, e.g., Evergreen Int'l, 531 F.3d at 308 ("Under maritime tort law, liability for collisions as well as allisions is

apportioned based upon comparative fault.").  Since the court has found that Barnett has failed to prove causation necessary to establish a successful negligence case against the government, application of the Pennsylvania Rule merely serves to emphasize that the decedent himself was negligent in operation of the Miss June.  The decedent's negligence is once again at the fore upon consideration of the Oregon Rule.

### b.  The Oregon Rule

The Oregon Rule is a presumption specific to maritime allision cases that provides that under well-established "admiralty law, a moving vessel that allides with a stationary, visible object is presumed to be at fault."  McLean Contracting Co. v. Waterman S.S. Corp., 277 F.3d 477, 481 (4th Cir. 2002) (citing The Oregon, 158 U.S. 186, 192–93 (1895)); see also Yarmouth Sea Prods. Ltd. v. Scully, 131 F.3d 389, 393 (4th Cir. 1997) (restating this presumption of fault).  "[A]pplication of the Oregon presumption does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence, it merely satisfies the plaintiff's prima facie case of negligence." McAllister Towing of Virginia, Inc. v. United States, 2012 WL 1438770, at *12 (E.D. Va. April 25, 2012) (quoting City of Chicago v. M/V Morgan, 375 F.3d 563, 572–73 (7th Cir. 2004)).  The Oregon Rule is most often applied to establish a presumption of fault where the owner of the stationary object sues the owner of the alliding vessel rather than as a comparative defense.  See, e.g., Waterman S.S. Corp., 277 F.3d at 478 (filing action against owner of barge that allided with stationary object that plaintiff was responsible for repairing); Yarmouth, 131 F.3d at 390–91 (filing action against owner of ship that allided against stationary object); CSX Transp., Inc. v. M/V Hellespont Mariner, 943

F.2d 48 (4th Cir. 1991) (unpublished table opinion) (same); O'Bannon, 2005 WL

8164681, at *1–2 (same). Consequently, the government's citation to the Oregon Rule

presents a somewhat novel application given that the government is the defendant and the

owner of the stationary object; for that reason, the court analyzes the Oregon Rule under

affirmative defenses.[8]

The Oregon presumption has generally been limited by the courts to cases

involving allisions with stationary visible objects. See Yarmouth, 131 F.3d at 393 ("A

venerable rule of admiralty jurisprudence is embodied in the presumption of The Oregon

. . . . namely, that a moving vessel is presumed to be at fault in a collision with a

stationary visible object.") (emphasis added). Such limitation is well founded since the

Oregon Rule is "derive[d] from the common-sense observation that moving vessels do

---

[8] The Fourth Circuit has not examined the question of comparative negligence after a finding of presumptive fault under the Oregon Rule, but other circuits have placed the Oregon Rule's finding of fault under the question of breach. See, e.g., Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport, 596 F.3d 357, 363 (6th Cir. 2010). The Oregon Rule works as a burden-shifting doctrine, "not a rule of ultimate liability." M/V Morgan, 375 F.3d at 572; Bessemer & Lake Erie R.R. Co., 596 F.3d at 363 ("It would be odd . . . to transform a modest evidentiary presumption into a rule that wiped out a longstanding tradition of shared fault in allision cases."). As the Sixth Circuit explained, "the Oregon Rule . . . speaks explicitly only to a presumed breach on the part of the alliding vessel, and is not a presumption regarding either the question of causation . . . or the percentages of fault assigned parties adjudged negligent." Bessemer & Lake Erie R.R. Co., 596 F.3d at 363; see also In re Mid-South Towing Co., 418 F.3d 526, 532 n.6 (5th Cir. 2005); accord Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 212 (2d Cir. 2009). That means that even if the court finds the decedent at fault for the accident under the Oregon Rule—which the court does—Barnett may nevertheless argue comparative negligence to absolve the decedent of some of the responsibility. Bessemer & Lake Erie R.R. Co., 596 F.3d at 363. This would clearly be the appropriate procedure with consideration under breach had the government brought the instant case against the decedent and/or Moran. But since the decedent's widow brings this case against the government, these presumptions and procedures are only considered in the court's evaluation of affirmative defenses rather than the prima facie case of breach or causation.

not usually [a]llide with stationary objects unless the vessel is mishandled in some way."
M/V Hellespont Mariner, 943 F.2d 48.  The presumption of mishandling loses force
when the stationary object is submerged or invisible since a vessel can certainly be
piloted with due care yet still strike an invisible or underwater obstruction—unless the
pilot has knowledge of the hazard's existence and location.  Dann Marine Towing, L.C.
v. McLean Contracting Co., 2010 WL 1486008, at *5 (E.D. Va. Jan. 21, 2010); see also
Delta Transload, Inc. v. Motor Vessel, Navios Commander, 818 F.3d 445, 450 (5th Cir.
1987) (holding that the party seeking to invoke the Oregon Rule must prove either: (1)
"visibility" of the stationary object; or (2) knowledge of its existence and actual location).

The court first finds that the dike was visible, and even if it were not visible, that
the decedent had knowledge of its existence and actual location because he piloted that
stretch of the river hundreds of times.  In similar cases, courts have found the Oregon
Rule to apply where the allision occurred in a known hazardous area if the pilot knew
from personal experience, from current or former navigation buoys or navigation charts,
or because the location was relayed over the radio that the area should be avoided.  See,
e.g., Evergreen Int'l, 531 F.3d at 309 (affirming the district court's ruling finding a
container ship ninety percent at fault for alliding with an underwater dredge pipe located
outside of the navigable channel and at depth of twenty-seven feet when the container
ship draws almost thirty-seven feet); Am. Tel. & Tel. Co. v. Steuart Transp. Co., 1978
A.M.C. 1680 (D. Md. 1977) (finding the defendant wholly at fault for striking and
damaging the plaintiff's underwater telephone cables because the defendant's vessel was
operating "perilously close to the cables" in an area where "danger would probably be

encountered" as the vessel was traveling "outside the channel in an area where there was not sufficient water to navigate").

Since the allision occurred outside of the navigational channel against a known hazard, the Oregon Rule applies in this case. The decedent should have known from current or former navigation buoys or navigation charts that the area where the allision occurred was to be avoided. First, the contraction dike is not in or part of the navigable channel. Second, three of the four lights on the dike were lit, with only the western-most light dark, such that the dike should have been visible to diligent mariners. Further, the western-most yellow light, the contraction dike, and ATONs 49-A and 49 were charted. Nevertheless, the GPS chart plotter on the Miss June was not being used at the time of the allision. Third, the decedent must have also known to avoid the area from personal experience. The decedent had been on at least 524 jobs for Moran and the court heard testimony that about half of those jobs would have been at night, and a great many of those jobs would have been south of the Moran dock such that the decedent would have transited past the contraction dike many times. Consequently, the Oregon presumption applies to this case.

Applying this presumption, the court finds the Miss June, and consequently the decedent, were negligent for the July 6, 2018 allision with the northern contraction dike on the Cooper River. To rebut this presumption, Barnett must show that "(1) the moving vessel was without fault; (2) the collision was the fault of the stationary object; or (3) the accident was inevitable." M/V Hellespont Mariner, 943 F.2d 48 (citing Wardell v. Dep't of Transp., 884 F.2d 510, 512 (9th Cir. 1989)). Barnett has nothing to rebut the Oregon presumption: the evidence shows that the Miss June was at fault for the allision; the

defective lighting of the western light did not proximately cause the allision, and  neither party argues that the accident was inevitable, nor does the court find the accident to have been inevitable.

Thus, the court reaffirms its finding that the decedent was negligent—both for failure to comply with statutory navigation rules meant to prevent allisions and for failure to overcome the presumption that a moving vessel that allides with a stationary object is presumptively at fault.  The court reiterates that the decedent's negligence was the superseding cause of the allision.  Consequently, since the government was not at fault for the allision, the government is not liable for any damages resulting from the allision notwithstanding the use of pure comparative fault in maritime negligence causes of action.  See McAllister Towing of Virginia, Inc., 2012 WL 1438770, at *13 (quoting Reliable Transfer Co., 421 U.S. at 411).

### D.  Motion for Judicial Notice

Finally, the court turns to Barnett's motion for judicial notice, ECF No. 106. Specifically, Barnett asks the court to notice two exhibits: (1) U.S. Department of Homeland Security United States Coast Guard Local Notice of Mariners Weekly Edition District: 7 Week: 18/07 (the "Local Notice 18/07"), and (2) a report by news outlets that a nighttime allision with the dike occurred on April 25, 2022 (the "2022 Allision Article").  ECF No. 106.  The government objects to the court taking notice of both exhibits, ECF No. 107, and the court denies Barnett's request for the reasons that follow.

Under Rule 201 of the Federal Rules of Evidence, a trial court may take judicial notice of facts on its own accord and must take judicial notice of facts "if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c).  A fact

is appropriate for judicial notice if it is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Rule 201 applies only to adjudicative facts, which "are simply the facts of the particular case."  Fed. R. Evid. 201(a) advisory committee note. "Adjudicative facts must, by definition, be relevant.  United States v. LaRouche, 4 F.3d 987 (table) (4th Cir. Sept. 13, 1993) (per curiam) (citing 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5104, at 483–84 (1977)).  "Further, whether information is the proper subject of judicial notice depends on the use to which it is put."  Clatterbuck v. City of Charlottesville, 708 F.3d 549, 558 (4th Cir. 2013), abrogated on other grounds, as recognized in Cahaly v. Larosa, 796 F.3d 399, 405 (4th Cir. 2015).  The party requesting judicial notice of the fact bears the burden of proving that Rule 201's standard is satisfied.  Loftus v. F.D.I.C., 989 F. Supp. 2d 483, 489–90 (D.S.C. 2013).  Under Rule 201(d), a court may take judicial notice of a fact at any stage in the proceeding, even for the first time on appeal.  See Fed. R. Evid. 201(f) advisory committee note.

The consequences of a court taking judicial notice are significant.  Where the trial court has taken judicial notice of a fact in a civil matter, the judge must instruct the jury to accept that fact as conclusive.  Fed. R. Evid. 201(g).  A court taking judicial notice may also preclude the introduction of evidence to disprove the noticed fact.  See Fed. R. Evid. 201(g) advisory committee note (discussing controversy surrounding whether evidence may be admitted to disprove facts judicially noticed).  As stated in the Advisory Committee Notes to Rule 201, a "tradition of circumspection" surrounds judicial notice

of adjudicative facts, and courts should exercise caution in taking judicial notice, doing so only when the matter is beyond reasonable controversy. Fed. R. Evid. 201(b) advisory committee note; see In re Harmony Holdings, LLC, 393 B.R. 409, 412–13 (Bankr. D.S.C. 2008).

Here, Barnett has failed to explain the particular facts of the exhibits she wishes the court to notice—instead she asks the court to take judicial notice of the two exhibits in their entirety as opposed to noticing specific statements contained therein. Thus, asking the court to notice those documents in their entirety should be disfavored because it could yield unforeseen repercussions later in the litigation or appeals. See Loftus, 989 F. Supp. 2d at 490. Moreover, Barnett has failed to explain how the two exhibits are relevant, which is her burden to prove. The court examines each exhibit in turn.

First, the Local Notice 18/07 is only described as something "compiled, published, and issued by the United States Coast Guard and contains information regarding aids to navigation." ECF No. 106 at 1. It is thirty-seven pages long, and Barnett has not identified any specific information in those thirty-seven pages that is relevant to the instant case. ECF No. 106-1. As in Loftus, where the court found the defendant's request to take judicial notice of six documents in their entirety without "noticing particular statements contained therein" to be improper, Barnett's request to the court to notice the entire Local Notice 18/07 is unnecessarily extensive. 989 F. Supp. 2d at 490. The court finds that Barnett has not met her burden under Rule 201 for the Local Notice 18/07, and the court therefore declines to take notice of that exhibit.

Second, the 2022 Allision Article is merely described as a news report of an allision with the same contraction dike that occurred on April 25, 2022. ECF No. 106 at

2.  Barnett does not explain its relevance, nor does she highlight any statements in the article for the court to take judicial notice of.  ECF No. 106-2.  Even if the court were to presume the allision relevant because a boater has once again allided with the same dike, Barnett has failed to allege facts that support finding that the local news article is a source "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  As the government points out, "[t]he article has never been vetted, nor are there any means to determine the accuracy of the reporting."  ECF No. 107 at 3.  "Generally, a news article cannot be judicially noticed for the truth of what is reported, but can be judicially noticed for facts such that a fact was printed."  Bradacs v. Haley, 58 F. Supp. 3d 499, 511 (D.S.C. 2014) (citing Shahar v. Bowers, 120 F.3d 211, 214 n.5 (11th Cir. 1997)).  Alternatively, the court could take judicial notice of a collection of numerous articles to show that a fact was widely known.  Id. (citing In re Cree, Inc. Sec. Litig., 333 F. Supp. 2d 461, 470 (M.D.N.C. 2004); Caner v. Autry, 16 F. Supp. 3d 689, 696 n.11 (W.D. Va. 2014)).  Barnett has provided no explanation of why the court should take judicial notice of a single news article.  Presumably she wishes the court to take judicial notice of it for the truth of what is reported—that another boater has crashed into the dike.  That request, standing alone, does not meet the burden established by Rule 201 and the court declines to take judicial notice of that article.

For the foregoing reasons, the court denies Barnett's motion for judicial notice. ECF No. 106.

## IV.   CONCLUSION

For the reasons set forth above, the court **FINDS FOR THE GOVERNMENT.**

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 10, 2022**
**Charleston, South Carolina**